May it please the court. My name is Steve Hedinger. I represent the appellant and plaintiffs below in this case and I'm here today to seek a new trial in this matter for several reasons. Briefly, the facts are my client, one of my clients, Kelsey Marku, back in November of 2012 was walking the family dog, a trained hunting dog, and during the course of that walk a pit bull attacked and her chocolate lab got into the fight with this great pit bull. She and a bystander tried to break up the fight, were unsuccessful, so they called the police requesting assistance in saving her dog and breaking up this fight. Sir Andre Davis, the defendant in this case, arrived at the scene a couple minutes later and within about 30 seconds he had gotten out of his car, he had looked around the scene, he had spoken briefly with the bystanders, my client and and Tyrone Jones, and then he pulled his gun and shot at the dogs. He was aiming at and he hit with his second shot the chocolate lab rather than the chocolate lab was shot. The pit bull ran away and he ended up chasing that pit bull and firing several more shots at him. So these facts created this lawsuit and there's a recognized cause of action under the Fourth Amendment for a police shooting of a dog and this court itself has recognized that a shooting of a household pet can only be reasonable under certain circumstances and so we took that case to trial. He shot the wrong dog? Well he shot the dog he was aiming at. He shot the dog that he thought was the aggressor. Now we in our complaint we alleged these facts and we alleged that Officer Davis's actions were unreasonable and that he had other actions that he did not consider and did not take prior to shooting, which is consistent with this court's precedent that says that shooting a household pet is only reasonable if the dog is, if a person is in imminent danger and there are no other alternatives. And so we alleged several alternatives including that the officer could have called for backup, he could have used his pepper spray that animal control assistance, several others and those were listed in the complaint. The answer we received from the defendants was that they had no information about those options. The answer was we have insufficient knowledge of the existence of these alternatives to answer this. Following that I served discovery. We submitted interrogatories to the police and I asked Officer Davis to describe in his own words what he did and why he did that and I also asked him to provide all of the facts supporting his denial that the shooting of the dog was unreasonable. In both instances his answer was I wrote a police report, everything I have to say about this is in that police report. Full answer to your interrogatory is in the police report. At that time what was the transcript of the 9-11 call? Where was that? Where was that? That was submitted to us I believe in discovery responses. Now when you did this deposition did you have that? Well first I did a deposition of Matthew Crane who was Officer Davis's superior and I had it with me at that time. I questioned Sergeant Crane about the whole system of dispatch. Sergeant Crane explained that what the dispatch writes on the transcript is not necessarily what they say over the radio and in this case yes the transcript or the written document said something along the lines of a woman being attacked or a woman walking her dog being attacked. Officer Davis in his police report just said that he was and he wasn't the one that was called to this. He was not the recipient of that dispatch at all. The dispatch went to an Officer Tennille. Officer Davis was on his way to a different call but he heard over the radio this call and in his report he described it as a call for a woman walking a dog and a pit bull, a stray pit bull attack. He didn't say anything about the attack the victim dog being almost dead. I asked him in his deposition and you're correct that in his deposition I did not have the dispatch report in front of him. I didn't see any reason to do so because he according to Sergeant Crane you know what what is said over the radio is not necessarily what is written in that the dog being almost dead. So you decided that wasn't a question that you wanted to ask? Well I was also aware from Officer Davis' testimony that he'd never saw that written report. The written report only shows up on the screen of the officer to whom it is directed. So all he heard was what was over the radio. And correct I didn't ask him whether he, I mean I did ask what he heard and he did say he told me that police report was accurate in his deposition testimony and he never amended it. Well I think that, I just bring it up because that is sort of an issue here, sort of a side issue about whether or not he thought that somebody said the dog was almost dead, meaning there's no time to call animal control. I understand and that's the very part of the seriousness of what we consider these discovery breaches. I would add that Mr. Yu, the attorney for Officer Davis clearly had that same, he was present at the deposition with Sergeant Crane so he had that as well. He had that transcript? Oh yes, they provided it to us. And he was present when I questioned Sergeant Crane about it. So it was flowing between the parties at that point. What did Officer Davis hear on the communication? Well according to his report, as he expressed it, he said twice, one in the synopsis, officers were dispatched to a vicious pit bulldog running at large and then in the narrative of his report he said, while en route to an alarm call, Metcad dispatched a call regarding a vicious pit bulldog in the area of John and Crescent. So that's all he said about that. No, I understand. Do we have a transcript, right, of the dispatch call? The dispatch call, we do, your honor. Yeah, and you say it wasn't directed? Oh, I'm sorry, this is not a transcript. I'm sorry. My understanding from the evidence in the record is this is not a transcript of what she said over the radio. This is what is written in the computer report that they generate. No, I understand. What evidence do we have of what was said over the radio? I don't have any. I didn't have any need to other than what Officer Davis said he heard. And all he said he heard was there's a vicious pit bull. What was it about, I thought you mentioned about a woman involved? The dispatch report that the dispatcher typed in concerning what she was saying. What she typed in was FEM, meaning female, walking a dog and a pit bull is attacking her dog, period, the dog is almost dead. So that was what was typed in the report. And that shows up on the screen of the officer who is dispatched to the call, but not to everybody else on the force. So Officer Tennille apparently saw that, but Officer Davis did not. All he knew was what the dispatcher said over the radio. Well, he was kind of intercepted on the way to another call, right? Yes, that's my understanding of what happened. We're already into my rebuttal time, so unless it's... Well, it's your time. You can go into your rebuttal time, but it just eats away at it. I will have a second. Mr. Yu. Thank you, Your Honors. My name is Tom Yu. My last name is spelled Y-U. I represent the appellees in this case. They are the City of Champaign, Illinois, as well as Officer Andre Davis. Judge, there were some facts missing from Mr. Hettinger's summary. November 17, 2012, approximately 5.30 p.m. This is near Centennial Park, near the streets of John Street and Crescent. Everyone stipulates that it was very dark. Very dark? Very dark at the time. So much so that when the officer arrived, he had to train his spotlight onto the dogs that were fighting. He described the dogs as being dark and darker in his deposition. Now, there's been questions regarding the dispatch ticket posed to Mr. Hettinger. It's critical in this case, Judge, because what he has alleged is that the trial testimony where Officer Davis testified that he relied upon specific words from the dispatch, that that was withheld in discovery and was a violation. That's not what happened here, Judges. It's clear from the record, and Mr. Hettinger stated so, that the dispatch ticket was part of the discovery that was disclosed. Police report, the dispatch ticket. That's basically all we had, the city of Champaign. Those documents were disclosed early in the case. In the initial Rule 26 disclosures, Officer Davis said, one of the topics of my testimony at trial will be on my arrival to the scene pursuant to the dispatch. The police report clearly indicated that he arrived on scene in response to a dispatch call of a vicious pit bull attack. Is this one of the overheard because it was general? Yes. The confusion here is this. Officer Davis was responding to a burglar alarm call at the time. On his way there, he heard over the dispatch radio that a female was walking her dog was attacked by a vicious pit bull. The dog is almost dead. Now, he wasn't trained on that because he was going to the alarm call. But he heard it, and while on route to the alarm call, he got waved down by juveniles at the corner of John and Crescent. And so he pulled over to see what was happening, and it was the exact vicious pit bull attack that was described over the radio that he was seeing. Was there a suggestion that the woman was being attacked? No, I don't believe so, Judge. Her dog is being attacked? Yes. To clarify, the dog was being attacked. The dog is on a leash. The dog is on a leash. The dog had a collar. The dog is being attacked. Now, she spent some time with the bystander trying to separate these two dogs, and they could not. That's when they called the police. That's when Officer Davis arrived on scene. The bystander was somebody who had familiarity with fighting dogs, as I recall. An uncle who did that or something? The bystander, his name is Tyrone Jones. He was just someone in the neighborhood, and this pit bull that was involved in the attack, it was following him around for some time before the attack. Oh, the dog was following Tyrone around? Yes. That's the testimony from trial and a supposition. And so when Ms. Sarku was walking her dog at the park, the pit bull saw it and ran towards it, and then they got locked up into an exchange. Mr. Jones came by to try to help, and the testimony was they spent some time trying to separate the dogs. He kicked the dogs. He took a branch, tried to separate them. He could not. They called the police. So Judge Rule 26 requires that the discovery disclosures be amended, supplemented, or corrected if the information was not otherwise disclosed, not otherwise made available in discovery. It was clearly available in discovery. We gave him the ticket. He asked Sergeant Crane at his deposition questions regarding the ticket. It's an exhibit in his deposition. Now, when he deposed Officer Davis, he never took the ticket, put it in front of him, and asked him questions about what was said and what was heard. He just didn't do it. So at trial, he testified, Andre Davis testified, that yes, I recall now hearing that portion of the dispatch that said the dog is almost dead. That influenced my actions at the scene, that it was an emergency situation. And now, plaintiff's counsel says, unfair surprise. I didn't know about this. He had it the whole time. It's disingenuous for him to raise that as a discovery violation. He had the ticket. Now, why he didn't ask Davis at his deposition regarding it, that was his, I don't know why, he didn't. But that wasn't a material change in the disclosures. He had the ticket. He never asked about it. There was no responsibility upon Davis or the city to supplement that disclosure. What were you implying, that if he had asked that question, it would have opened up a disadvantage, I guess you could put it. It wasn't something he wanted to hear. I don't know if it was intentional or not, Judge. I do not know. I just know he didn't bring the ticket with him during Davis' deposition. It wasn't asked about. But it was not anything that, he was not hindered or prevented from asking about it in any shape, way, or form. He had the document. The other part of this, Judge, is even if this court were to side with him on this point and say, you know what, you should have disclosed more, you didn't disclose it all, it was a violation, it was harmless error. Because at trial, Mr. Hettinger tried to impeach Officer Davis and asked him, why didn't you bring this up before, this reliance upon the dispatch communication regarding the dog is almost dead. You never brought this up before to me. And Officer Davis said, you never showed me the ticket. We never talked about it. And frankly, I didn't remember looking at it until I prepared for trial. Then I looked at it and I recalled it. So it wasn't some sort of scheme to withhold evidence. We complied with the discovery rules. Judge, moving on. The other issue that was raised, which he has not talked about yet, is they have claimed that there was a jury instruction that they proffered that should not have been excluded. And that instruction would have confused the jury and it also would have misstated the law in Illinois. The instruction that he wanted was from the Vilo case that arose out of a Wisconsin incident where officers were searching for a wanted felon and in the course of doing so, they encountered a dog, they shot the dog. Our case is totally different because we have different facts. We had two dogs fighting. One was mauling the other, in Officer Davis's opinion, and he was trying to protect one of the dogs, save the dog that was being mauled. He was also concerned about bystanders in the area, including these juveniles who had weighed him down. If the two dogs separated, now you have a vicious dog who is open to the public and the people who are there. Those facts were not in the Vilo case. In addition, the Vilo case also applied Wisconsin law, where there's a statute in Wisconsin that says that a person, an owner, is not allowed to kill a dog unless he has made other efforts to restrain the animal and that there is a threat of serious bodily harm. There is no corresponding statute in Illinois. Mr. Hettinger has cited the Animal Control Act. That does not apply in this case. The Animal Control Act only applies to owners of animals. Officer Davis was not an owner of the dog that he shot. And also, the officers in general have tort immunity. The Animal Control Act does have a prohibition regarding killing animals, but not to the extent that the Wisconsin statute did in the Vilo case. So that instruction that came from the Vilo case to alter the definition of what is reasonable conduct when you're encountering an animal was excluded properly. The last issue I want to raise, Judge, is in their motion for a new trial, they've stated that the manifest weight of the evidence did not support the finding by the jury. The finding by the jury after one hour of deliberation was in favor of the defense, that Officer Davis was in fact reasonable. And in the paperwork, in the filings, in the briefs, in the motions, the appellants, the plaintiffs have said repeatedly that at trial, Officer Davis testified in a calm, rational, reasonable manner. Pursuant to his training and experience. Well, I think, I don't recall exactly, but the judge was sort of saying that most of the plaintiff's case was the distress for the loss of the dog. That's entirely correct, Judge. The strategy by the plaintiffs apparently was to emphasize the loss of the dog, the emotional distress, the financial value of the dog. And there was testimony when one of the owners was on the stand, he was testifying as to all the training the dog had had as a hunting dog. And Mr. Hettinger asked him, what is the value of that training? What do you think the dog is worth? And he said $100,000. I objected, but it was out there. And so that was a bell that you could not unring as the jurors were sitting there. Well, the guy was raised on a farm. I don't know what it's like to lose an animal when sometimes you have to put them down and all kinds of things. So I understand the emotion, but I think what the problem the judge had was, look, that's understandable. It's hard to put value on that. But it wasn't focused as much as the case here about why he shot the dog. It was mostly the fact that the dog was shot. It was a great loss to them. That was the impression by Judge Bruce, the district court judge, yes. Judge, I know I said lastly, but I forgot to raise the jurisdictional issue in this case. The trial concluded on July 9, 2015, and Mr. Hettinger filed timely his motion for a new trial under Rule 59. And it raised the three issues that we discussed just now. However, in the appeal, he has a fourth issue regarding there was a pre-trial motion for summary judgment that the city filed regarding the Monell claim. And the judge granted it. And now in the appeal, he's arguing that that should have been overturned. The problem is he's outside the box. He's out the box. He never raised this in his post-trial motions within 30 days. It was raised for the first time, arguably, in the notice of appeal. So that issue was not preserved for appeal. If he was going to challenge the ruling on the motion for summary judgment, it needed to be raised within 30 days after judgment was entered, and it was not. The record is very clear on this. And I would point you to the briefs where he spends a very cursory treatment of that issue. I think they know it was sort of a throw-in argument. So this court, in my opinion, does not have jurisdiction to rule upon that issue. Okay, thank you, Mr. Yu. Thank you. Mr. Hettinger. Thank you. To return to this issue about the dispatch ticket, and I do so with some hesitation because that's just one of the, I count, five different discovery violations that resulted in sandbagging during trial. But as far as that particular one goes, in terms of who knew what and when it was said, Mr. Yu just acknowledged that Officer Davis himself did not even remember, having heard the dispatcher say that the dog was almost dead, until he was preparing for trial. And there's no explanation for why the defendant at that point didn't at least send a supplemental discovery response to make it clear that, oh, by the way, the police report and our interrogatory answers are not completely accurate. I mean, that's what Rule 26 requires, is that they do that. If he had two weeks before trial, I would have had a time to have adjusted my strategy, dealt with it a little better. I did get to cross-examine him on it, but it was on the fly. I had no preparation. I was not able to ask Sergeant Crane, for instance, because it hadn't been an issue. But Sergeant Crane did testify at trial. I had no reason to ask him about those dispatch tickets. So all these facts that I'm explaining to this court was never presented to the jury because I didn't know until Davis took the stand that he was going to say that. But the other issues that he brought up for the first time at trial that hadn't been raised in any previous and actually were contrary to things that he had said before. For instance, in his report, he says, when I pulled up, I noticed there were two dark dogs. One had a white belly. Now, that's important to me because it tells me right from the time he arrived, he saw a distinguishing characteristic. And he could have said, for instance, now is your dog the one with the white belly? Because the dogs look alike, but one of them has a white belly. And so is that one yours? And she would have been able to say, no, mine is the chocolate lab. That wasn't done. But in trial, he said, oh, even though my report says that I noticed that white belly as soon as I drove up, that's not true. It was only later, after I'd shot the dogs and they'd separated, that I realized one had a white belly. And so my report was wrong. Well, Rule 26 specifically requires if he's going to change his testimony, he has to give me a heads-up on that. And this is completely contrary to what he testified both in his deposition and in that report. Well, which dog had the white belly? The pit bull. He took off. After the lab was shot, yes. Yeah, well, it was. And what Davis is saying is that when I drove up and pulled up the dogs, what he said in his police report, and what I believed clear up until the time that Officer Davis was on the witness stand, was that when he pulled up his squad car, he could tell two dark dogs. He couldn't distinguish those colors, but one of the dogs had a white belly. So from the moment he arrived, he saw a distinguishing characteristic. At trial, Officer Davis said, well, no, it was only after the dogs separated that I realized one of them had a white belly. Well, he realized it because the one that was shot didn't have one? I assume, yes. At that point, they're separated. He could see one was a solid color and the other one had a white belly. But the point I'm making, I guess, is that clear up until the time of trial, I thought the case was going to go one direction. It didn't. Furthermore, even though he had answered the complaint that I don't know anything about alternatives to shooting, in his answer he said that, and in his interrogatory answers he didn't say anything about a mental checklist. He didn't say anything about I considered this option and this option, and I decided those weren't available. They showed up in trial out of the blue. And contrary to both his answer to the complaint and his answers to discovery and his answers in his deposition, and those were critical facts, those allowed the jury, as Mr. Yu was just describing, to see Officer Davis in a completely different light than the light that he had been presented in his summary judgment motion and clear up to my preparation for trial. Prior to that, the battle lines had been drawn with what the three people who were there, the eyewitnesses saw and experienced. Was it dark? That was not stipulated. Everybody, even Sergeant Crane, said it wasn't all that dark. He could distinguish the colors. But was it too dark? Was there a lot of cacophony and chaos going on based on what was going on at the scene? Did Officer Davis believe there was an emergency and he didn't have any time to do anything other than 30 seconds, start shooting? That's where the battle lines were drawn until he testified at trial and said, you know, I sat there and I thought about all of these options, and I went through them all one by one and I discounted. I can't call for backup because there's a shift change. I can't use OC spray because there's people around. And I would add, Your Honors, that doing that turned him into an expert witness, an opinion witness, and he had never been disclosed as such. So all of a sudden at trial, here he is changing the whole direction of the case, and that's why I think we're entitled to a new trial. When he was deposed, Mr. Hedinger, did you ask him any of these questions about did you consider options? I mean, all the points that you were raising about what he testified to, none of those could have been anticipated, you're saying, under the theory of the cases you understood from the interrogatories of the deposition? Right. I had his answer that said that they didn't know anything about options. I did ask him if he had on his person and with him in the car the OC spray. I did ask him about, we did know that, for instance, Sergeant Crane arrived within two minutes of having been called and other police officers arrived shortly after that. We did cover those things, but I didn't specifically ask him if he had, you know, were you telling the truth when you answered the complaint? And I didn't ask him, were you telling the truth when you said that everything about this case is included in your police report? I did walk through the police report with him and, you know, item by item and made sure that if there was anything that wasn't fleshed out that I understood what was going on because that's what he said were the facts. Let me ask you this. Let's assume there's a technical violation of Rule 26. Lay out for me in one or two thoughts what was the essence of the surprise that took away your theory of the case. Well, again, the battle lines that I thought we were going to trial, and you can read Mr. Yu's opening statement because he pretty well summarized it because even as of the opening statement, this seemed to be where we were going, that we had three people present and Mr. Davis was going to testify that it was dark. I have this color blindness and it affected my ability to tell which dog was which. Everybody was shouting. I was confused. And because they were shouting, I thought, gee, I need to do something right away. And I had two witnesses, and three actually if you count Sergeant Crane, who were going to say, no, it wasn't that dark. We could distinguish colors. And while certainly Kelsey Barku was crying, there was no hysteria. It wasn't chaos. And you just showed up and in 30 seconds, for some reason, decided to start shooting. And it seemed like you didn't try anything else. Nothing from his bearing showed him doing anything else. Nothing in the record said, here's why. I mean, he could have answered the complaint. I could not have. I denied that these options were available, and then I could have followed that up with discovery saying, why? Why did you deny that? But if he says I don't know anything about it, I took him at his word. And so instead of that at trial, he suddenly, in addition to the battle line where I thought it was drawn, now we also have Officer Davis presenting himself as, look, I'm an experienced police officer. I've been through this before. From the moment I arrived, I started clicking through the possibilities here. My main concern, and this is where, in his closing, the focus by Mr. Yu shifted, he says the main concern of Officer Davis was the safety of the people around him. And because of that, we should be congratulating Officer Davis rather than suing him. Well, you could have anticipated that would be the defense in any event, right? I mean, that's what the city is going to say. He's a peace officer trying to resolve it. I mean, your position is he was a negligent officer. Well, correct, except to the extent that he's now presenting it as protecting the people who were there. It is undisputed and it is conceded by the defendant that no one was in any danger from these dogs. I want to know what you would have drawn. If you had everything you think you should have had, Mr. Hettinger, what more could you have drawn out by way of comment from any witness, but particularly Officer Davis, that would have aided you in your presentment to the jury or in your final argument? Well, certainly I would have put on evidence contradicting his assertion that O.C. spray was not available. In fact, one of his superiors that wasn't called because they didn't think we needed him had issued a report saying that he should have considered several other possibilities, one of which was O.C. spray. I certainly would have asked Sergeant. You could have asked that in any event, right? He wasn't there. I didn't know until Officer Davis was my last witness, and that's when he started bringing these things up. And by that time, most of my case was already on the table, and the witnesses were gone. I think I have your argument. Thank you very much. Thank you to both counsel. Case is taken under advisement.